IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MICHAEL ADDIB NAZZAL, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) 1:21CV968 |
| | ) |
| WARDEN JAMEL JAMES, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"). (Doc. 1.) Respondent filed an Answer (Doc. 4), a Motion for Summary Judgment (Doc. 5), and a Brief in Support of the Motion for Summary Judgment ("Resp.'s Br.") (Doc. 6). In lieu of responding to the Motion for Summary Judgment, Petitioner filed a Motion for Leave to Amend Petition Pursuant to Rule 15(a)(2) and Motion for Stay and Abeyance ("Motion to Amend/Stay") (Doc. 7), and Respondent filed a Response (Doc. 8). Both motions are now ripe for adjudication, and for the reasons that follow, this court will grant Respondent's Motion for Summary Judgment and deny Petitioner's Motion to Amend/Stay.

I.  **PROCEDURAL BACKGROUND**

On February 22, 2018, Petitioner was convicted by a jury of second-degree murder, felony death by motor vehicle, felony hit and run causing death, driving while impaired ("DWI"), failure to maintain lane control, driving while license revoked ("DWLR"), DWLR for impaired revocation, displaying a revoked license plate, and operating a vehicle without insurance in the Superior Court of Orange County. (Petition (Doc. 1) at 1-2; Resp.'s Br., Ex. 1 (Doc. 6-2) at 2-6, Ex. 29 (Doc. 6-30) at 12-13.)[1]  The trial court arrested judgment on the convictions for felony death by motor vehicle and DWI (Resp.'s Br., Ex. 1 (Doc. 6-2) at 5-6, Ex. 29 (Doc. 6-30) at 69), consolidated the remaining convictions, and sentenced Petitioner for second degree-murder to a term of 175 to 222 months in prison (Petition (Doc. 1) at 1; Resp.'s Br., Ex. 1 (Doc. 6-2) at 2-4, Ex. 29 (Doc. 6-30) at 69).

Petitioner filed a direct appeal, and the North Carolina Court of Appeals found no prejudicial error in Petitioner's second degree-murder conviction and sentence, State v. Nazzal, 270 N.C. App. 345, 353-58 (N.C. Ct. App. 2020), but

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

ruled that the trial court erred in denying Petitioner's motion to dismiss the DWI and the felony death by motor vehicle charges, because the State presented insufficient evidence that Petitioner was "appreciably impaired" under N.C. Gen. Stat. § 20-4.01(48b) (2019) at the time of the collision, *id.* at 351-53.[2] Because the trial court had arrested judgment on the Petitioner's DWI and felony death by motor vehicle convictions, the Court of Appeals reversed those convictions without remanding for resentencing. Id. at 353. The North Carolina Supreme Court thereafter denied both Petitioner's and Respondent's petitions for discretionary review on September 23, 2020. State v. Nazzal, No. 158P20, 847 S.E.2d 418 (Mem) (N.C. Sept. 23, 2020) (unpublished), *and review denied*, 375 N.C. 491, 847 S.E.2d 885 (Mem) (2020).

On March 2, 2018, one day after filing his notice of appeal, Petitioner filed a Motion for Appropriate Relief ("MAR") in the trial court, moving to dismiss his convictions for operating a motor vehicle without insurance, displaying a revoked license plate, and DWLR (Petition (Doc. 1) at 3; Resp.'s Br., Ex. 13 (Doc. 6-14) at 2-12; see also id. at 13-32 (Amended MAR filed March 5, 2018, seeking same relief)) (collectively

---

[2] DWI is a necessary element of the felony death by motor vehicle offense. See N.C. Gen. Stat. § 20-141.4(a1)(2) (2019).

-3-

"First MAR"), as well as a MAR moving to dismiss his convictions for second degree murder, felony death by motor vehicle, and DWI (Petition (Doc. 1) at 3; Resp.'s Br., Ex. 14 (Doc. 6-15) at 2-12; see also id. at 13-30 (Amended MAR filed March 5, 2018, seeking dismissal of same convictions); id. at 31-61 (Second Amended MAR filed May 15, 2018, seeking dismissal of same convictions)) (collectively "Second MAR").

On April 14, 2020, after the Court of Appeals had issued its decision on direct appeal, the trial court denied the First MAR with respect to Petitioner's arguments directed at dismissing his convictions for operating a motor vehicle without insurance and displaying a revoked license plate (Petition (Doc. 1) at 3; Resp.'s Br., Ex. 15 (Doc. 6-16)), but granted the First MAR concerning Petitioner's conviction for DWLR as against the weight of the evidence presented at trial (Petition (Doc. 1) at 3; Resp.'s Br., Ex. 17 (Doc. 6-18) at 4-7).[3] On that same date, the trial court denied Petitioner's Second MAR, finding that the Court of Appeals' reversal of Petitioner's felony death by motor vehicle and DWI convictions mooted his arguments to dismiss

---

[3] As the trial court had consolidated all of Petitioner's convictions and sentenced him for the Class B-2 felony of second degree-murder, the reversal of his conviction for DWLR had no impact on his sentence.

-4-

those convictions (Petition (Doc. 1) at 3; Resp.'s Br., Ex. 17 (Doc. 6-18) at 2-3), and denying Petitioner's contentions directed at dismissing his second degree-murder conviction (Petition (Doc. 1) at 3; Resp.'s Br., Ex. 16 (Doc. 6-17)).

On May 6, 2020, Petitioner filed a notice of appeal with the Court of Appeals seeking review of the trial court's denial of his arguments aimed at dismissing his second degree-murder conviction raised in his Second MAR. Thereafter, on August 25, 2021, the Court of Appeals granted the State's motion to dismiss, finding Petitioner's arguments procedurally barred, see N.C. Gen. Stat. § 15A-1419(a)(2) & (3) (providing that MAR should be denied where either "[t]he ground or issue underlying the [MAR] was previously determined on the merits upon an appeal from the judgment" or "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present [MAR] but did not do so"). (Petition (Doc. 1) at 5; Resp.'s Br., Ex. 30 (Doc. 6-31).) Petitioner, proceeding through post-conviction counsel, filed the instant Petition with this court on December 21, 2021. (Petition (Doc. 1) at 1.)

## II. **PETITIONER'S CLAIMS**

Petitioner contends: (1) "[t]he affidavit supporting application for warrant to search cell phones seized from

-5-

Petitioner was conclusory and overly broad in violation of the 4th Amendment to the United States Constitution" (id. at 5); (2) "[t]he police inexcusably delayed seeking the search warrant for thirteen months after they seized cell phones in violation of the Fourth Amendment to the United States Constitution" (id. at 7); (3) "[t]he prosecution used two witnesses it found only through the unconstitutional search of the cellular phones and Petitioner was thereby substantially prejudiced" (id. at 8); and (4) "[t]he Court of Appeals used an incorrect prejudice standard by not requiring the State to show the admission of unconstitutionally obtained evidence was harmless beyond a reasonable doubt" (id. at 10).

## III. FACTUAL BACKGROUND

The North Carolina Court of Appeals summarized the facts from Petitioner's case as follows:

> Just before 2:00 a.m. on 17 December 2016, [the decedent] Mr. [Francisco] Nolasco's pickup truck was involved in a single-vehicle accident requiring assistance on I-40 West in Orange County. Road conditions that night were wet and icy. Mr. Nolasco called his friend and tow truck driver Omar Castillo ("Mr. Castillo") for assistance, and he arrived shortly thereafter. Upon realizing that Mr. Nolasco's pickup was precariously positioned partially in the right lane of traffic, Mr. Castillo immediately set about removing the vehicle from the road.
>
> Mr. Castillo testified that he then positioned his tow truck in front of Mr. Nolasco's pickup, partially in the right lane of traffic. For unknown reasons, the tow truck's cable system failed to lift the pickup

-6-

onto its rollback. At this time, Mr. Nolasco was standing on the shoulder of the road, with the tow truck between himself and the westbound lanes of traffic. Mr. Castillo began walking around the front of the tow truck to address the cable system malfunction. As he was in front of the tow truck, he heard screeching tires, dove over the guardrail, and observed a black Honda crash into the guardrail and hurdle forward, hitting the pickup and tow truck before proceeding down the shoulder between the tow truck and guardrail, hitting Mr. Nolasco and knocking him into the road.

Mr. Castillo testified that he went into the road to assist Mr. Nolasco and found him unconscious. He tried to signal oncoming cars but they did not see him, and he had to leave Mr. Nolasco in the road to preserve his own safety. Then another car traveling about forty seconds behind [Petitioner] ran over Mr. Nolasco. Based on his observation of the collision's intensity and Mr. Nolasco's unconscious body in the roadway, Mr. Castillo opined that [Petitioner]'s black Honda killed [Mr. Nolasco] before the second car arrived. He testified that the second car stopped immediately after hitting Mr. Nolasco, but [Petitioner] only stopped briefly and then continued.

Austin Phillips ("Mr. Phillips"), the driver of the second car, testified that he saw the tow truck's flashing lights and switched from the right to left lane of westbound traffic in order to "avoid any contact with the person that may be getting out of the tow truck[.]" After realizing he had run over a human body, Mr. Phillips immediately pulled over and called 911 for assistance.

Trooper Kyle Underwood testified that he, Trooper Matthew Morrison, and one other highway patrolman arrived at the scene at 1:54 a.m. and began taking measurements, recording witness statements, and investigating the wreckage and other evidence at the scene. Trooper Underwood noted damage to the shoulder's guardrail at a position prior to the tow truck, damage to Mr. Nolasco's pickup, and a missing passenger side mirror on the tow truck. He discovered the front bumper of a black Honda 99 feet away.

-7-

After searching the serial number on the bumper, the troopers discovered that it belonged to a 2010 Honda Accord registered to [Petitioner]'s name at a Greensboro address. They also determined that [Petitioner]'s tags and registration were currently revoked due to a failure to carry insurance and his driver's license was currently suspended for a previous DWI conviction. The troopers then contacted the Guilford County Sheriff's Office for assistance locating defendant.

Sergeant James Meacham and Master Corporal Todd Riddle of the Guilford County Sheriff's Office arrived at [Petitioner]'s Greensboro address just after 4:00 a.m. Thirty minutes later, [Petitioner] arrived in a black Honda Accord with significant front-end damage. This damage included deployed airbags, no front bumper, a shattered windshield, damage to the hood, missing headlights, and general body damage on the front of the car. Sergeant Meacham called Trooper Morrison and informed him that they had detained [Petitioner] at his residence. In his conversation with the deputies, [Petitioner] admitted that he had been involved in a collision but said "it wasn't a very bad one[,]" so he drove away. Sergeant Meacham testified that "[Petitioner's] actions indicated just a very carefreeness [sic] attitude about what had transpired[.]" The two deputies were relieved by deputies on the day shift at around 6:00 a.m.

Troopers Underwood and Morrison obtained an arrest warrant for felony hit and run and arrived at [Petitioner]'s residence in Greensboro at around 7:00 a.m. Trooper Morrison observed that [Petitioner]'s car was covered in droplets of ice and appeared to be much cleaner than his own patrol vehicle covered in road salt, despite both cars making a similar drive from Orange County to Greensboro in identical weather conditions. [Petitioner] was arrested and transported by the troopers to the Orange County Sheriff's Office for booking. Two cell phones found on [Petitioner]'s person at the time of his arrest were seized.

Based upon his observations of [Petitioner] while they were en route to the sheriff's office, Trooper

> Underwood testified that he formed an opinion that [Petitioner] was appreciably impaired to the extent that it was unsafe for him to drive an automobile at the time of the collision five hours earlier. In addition to the mere nature of the collision site and his flight therefrom, Trooper Underwood based this opinion on the following evidence. When he observed [Petitioner] at approximately 7:00 a.m., [Petitioner] had red, glassy eyes, was unsteady on his feet, and at times was "speaking out of his head" and "rambling, going on with half sentences, speaking [in a way] that just did not make sense." [Petitioner] also made contradictory statements regarding his location at the time of the collision, seeming confused about where it occurred. Additionally, [Petitioner] fell asleep on the ride to the sheriff's office. Trooper Underwood found this very strange because [Petitioner] had just been told the jarring news that he had killed a man. He stopped his patrol vehicle and had Trooper Morrison shake [Petitioner] awake, upon which [Petitioner] stated that he was fine. No other testifying officer formed the opinion that [Petitioner] was impaired at the time of the collision. Nor did any investigating officer ever subject [Petitioner] to any of the numerous field tests for impairment utilized by law enforcement.
>
> A later search of [Petitioner]'s phones revealed text messages tending to suggest he had been attempting to buy crack cocaine earlier in the day before the collision. The search also led the State to two testifying witnesses. Tiffany Haynes ("Ms. Haynes") testified that [Petitioner] called her for a "date" the day of the collision, stating that he would drive from Cary to her motel room in Greensboro that night. Because they had done the same thing on a previous "date" three weeks prior, Ms. Haynes believed that [Petitioner] intended to smoke crack with her, engage her in sexual intercourse, and then smoke marijuana. Robert Tate testified that [Petitioner] had bought an ounce of high-grade marijuana from him the day before the collision.

Nazzal, 270 N.C. App. at 347-49.

## IV. DISCUSSION

### A. Motion for Summary Judgment

Respondent raises four arguments in support of the Motion for Summary Judgment: 1) "28 U.S.C. § 2254 does not grant this Court jurisdiction to consider Petitioner's present claims, as the convictions stemming from the alleged errors have been overturned on other grounds[ and t]herefore, he cannot be 'in custody in violation of the Constitution' as required to satisfy section 2245" (Resp.'s Br. (Doc. 6) at 10); 2) "this court should not consider Petitioner's claims [under Stone v. Powell, 428 U.S. 465, 494 (1976)] because he had a full and fair opportunity to litigate them in state court" (id. at 15 (capitalization and bold font omitted)); 3) "the [Court of Appeals'] decision was not an unreasonable application of clearly established federal law as determined by the [United States] Supreme Court" (id. at 17 (capitalization and bold font omitted)); and 4) "Petitioner's Fourth Amendment rights were not violated" (id. at 25 (capitalization and bold font omitted)). For the reasons more fully explained below, the court finds that the rule in *Stone* bars the court's review of all four Grounds for Relief in the Petition.

As an initial matter, as discussed above, in lieu of responding to the merits of the arguments Respondent raised in

-10-

the Motion for Summary Judgment, Petitioner filed his Motion to Amend/Stay. As this court has previously recognized:

> Under the local rules, an uncontested motion is "ordinarily . . . granted without further notice." L.R. 7.3(k). However, . . . [a] district court may not grant a motion for summary judgment merely because it is unopposed. Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir.1993). It must still consider the motion on the merits . . . .

Gardendance, Inc. v. Woodstock Copperworks, Ltd., 230 F.R.D. 438, 448 (M.D.N.C. 2005). Thus, although Petitioner's "failure . . . to respond to [Respondent's] summary judgment motion may leave uncontroverted those facts established by the motion, [Respondent] must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law,'" and the court will "review [Respondent's] motion, even [as] unopposed, and determine from what it has before it whether the [Respondent] is entitled to summary judgment as a matter of law." Custer, 12 F.3d at 416.

Grounds One, Two, and Three of the Petition all assert violations of the Fourth Amendment to the United States Constitution arising out of an allegedly unconstitutional search of Petitioner's cellphones. (Petition (Doc. 1) at 5, 7, 8.) Ground Four faults the Court of Appeals for applying the wrong harmlessness standard when rejecting Petitioner's argument *under the Fourth Amendment* that the trial court erred by denying his

-11-

motion to suppress evidence obtained by the police through an unconstitutional search of his cellphones. (Id. at 10.) Accordingly, all four Grounds for Relief are rooted in the alleged unconstitutionality of the search of Petitioner's cellphones under the Fourth Amendment.

Under the rule in *Stone*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone, 428 U.S. at 494. As the United States Court of Appeals for the Fourth Circuit has long recognized, the court must "first inquire as to whether or not [ P]etitioner was afforded an [o]pportunity to raise his Fourth Amendment claims under the then existing state practice." Doleman v. Muncy, 579 F.2d 1258, 1265 (4th Cir. 1978). After the "court has made the 'opportunity' inquiry, it need not inquire further into the merits of [ P]etitioner's case . . . unless [he] alleges something to indicate that his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired." Id.

The record before the court conclusively establishes that Petitioner had a full and fair opportunity to litigate his

Fourth Amendment claims in the state courts, as well-explained by Respondent:

> In a pre-trial motion to suppress, Petitioner sought to "suppress all evidence obtained in this case pursuant to the search warrant issued" for his cell phones. [(Resp.'s Br., Ex. 32 (Doc. 6-33) at 2.)] The trial court held a pre-trial hearing on this issue, where the State presented evidence and Petitioner declined to present evidence. [(Id., Ex. 19 (Doc. 6-20) at 11–28.)] Both parties argued the law supporting their position. [(Id. at 28-55.)] The trial court considered all available evidence and law, and denied Petitioner's motion. [(Id., Ex. 33 (Doc. 6-34).)] Petitioner sought review on appeal. There too, his Fourth Amendment claim was unanimously denied by the [Court of Appeals]. [(Id., Ex. 6 (Doc. 6-7).)] Petitioner finally sought review by the [North Carolina Supreme Court], but his petition for discretionary review was denied by that court. [(Id., Ex. 11 (Doc. 6-12).)]

(Id. at 16.) Moreover, as Petitioner opted not to respond to Respondent's Motion for Summary Judgment, he has not presented the court with any argument that his opportunity to litigate his Fourth Amendment claims in the state courts was impaired in any way. (See Petition (Doc. 1).)

In sum, the rule in *Stone* bars this court's review of all four of the Grounds for Relief in the Petition and thus the Court will deny the Petition.

### B. <u>Motion to Amend/Stay</u>

Petitioner moves the court under Rule 15(a)(2) of the Federal Rules of Civil Procedure "for leave to amend his Petition to include a claim for ineffective assistance of

-13-

appellate counsel under the Sixth Amendment to the United States Constitution; and if this Court grants such leave, for a stay and abeyance of his pending 28 U.S.C § 2254 habeas petition while he exhausts his state claims for ineffective assistance of appellate counsel." (Mot. to Amend/Stay (Doc. 7) at 1.) Petitioner describes his proposed new ineffective assistance claim as follows:

> Under North Carolina law, second degree murder can result from violations of the motor vehicle code if said offenses proximately cause a person's death and if said motor vehicle violations are committed with malice. The second degree murder charge in Petitioner's case was premised on two alternate theories – that is, two predicate offenses were submitted to the jury. The first predicate offense was [DWI]. The second predicate offense was Failure to Maintain Lane Control ("FTMLC").
>
> At trial, Petitioner's trial counsel objected to both offenses being offered as a predicate offense to support second degree murder. His objection was denied. Petitioner's trial counsel also requested the trial court to issue a special verdict sheet to the jury that would allow the jury to indicate whether they unanimously agreed that Petitioner had committed DWI with malice or FTMLC with malice (or both). The trial court denied trial counsel's request for a special verdict sheet.
>
> Petitioner was convicted of second degree murder as well as DWI and FTMLC. Petitioner appealed his convictions. On direct appeal, the [Court of Appeals] held that "the trial court erred in denying defendant's motion to dismiss the DWI . . . due to insufficient evidence of impairment." Based on the [Court of Appeals'] ruling, DWI should not have been submitted to the jury as a predicate offense for second degree murder; and without a special verdict sheet, there was and is no way to determine if the

> jury unanimously agreed that Petitioner committed the
> predicate offense of FTMLC with malice. This error
> entitles Petitioner to a new trial but Petitioner's
> Appellate Counsel failed to raise this issue on
> appeal.
>
> Clearly established North Carolina precedent shows
> that Petitioner was entitled to a new trial based on
> the lack of a special verdict sheet combined with the
> dismissal of the DWI that was used as a predicate
> offense for second degree murder. In State v.
> Pakulski, 356 S.E.2d 319 (1987), [t]he Supreme Court
> of North Carolina held that "Where the trial judge has
> submitted the case to the jury on alternative
> theories, one of which is determined to be erroneous
> and the other properly submitted, and we cannot
> discern from the record the theory upon which the jury
> relied, this Court will not assume that the jury based
> its verdict on the theory for which it received a
> proper instruction. Instead, we resolve the ambiguity
> in favor of the defendant." Pakulski, 356 N.C. at 326.

(Mot. to Amend/Stay (Doc. 7) at 6-8 (internal parenthetical citations and bracketed material omitted).)[4]

Regarding grounds to stay the Petition, Petitioner explains that "asserting the Sixth Amendment claim in this Petition at this time prior to exhausting his state remedies would result in the Petition being a 'mixed petition,'" and that "[i]f Petitioner dismisses his Petition while he litigates his Sixth Amendment claim in state court, he will be unable to refile his petition (if his Sixth Amendment claim fails) because of the

---

[4] Petitioner does not explain how his appellate counsel could have raised a claim on direct appeal that did not arise until the Court of Appeals reversed Petitioner's conviction for DWI. (See Mot. to Amend/Stay (Doc. 7).)

-15-

statute of limitations." (Mot. to Amend/Stay (Doc. 7) at 3.) According to Petitioner, the court should stay, rather than dismiss the Petition because, under Rhines v. Weber, 544 U.S. 269 (2005), he "'had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that [he] engaged in intentionally dilatory litigation tactics.'" (Mot. to Amend/Stay (Doc. 7) at 4 (quoting *Rhines*, 544 U.S. at 278).) Petitioner claims he can satisfy all three requirements under *Rhines*. (Id.)

"[28 U.S.C.] § 2242 specifically provides that habeas applications 'may be amended . . . as provided in the rules of procedure applicable to civil actions.'" Mayle v. Felix, 545 U.S. 644, 654-55 (2005). Under those rules, "[a] party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). In this case, Petitioner filed the Motion to Amend/Stay more than 21 days after

-16-

Respondent filed its Answer and Motion for Summary Judgment and thus must seek leave of court to amend the Petition under Rule 15(a)(2).

Under this standard, the United States Supreme Court has held that reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party . . ., [and] *futility of amendment*," Foman v. Davis, 371 U.S. 178, 182 (1962) (emphasis added). "[If] the statute of limitations has expired on [a] claim . . ., leave to amend would be futile unless the amendment relates back to the filing of the original [pleading]." Keller v. Prince George's Cnty., 923 F.2d 30, 33 (4th Cir. 1991).

Petitioner has conceded that the one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1), expired on December 22, 2021, i.e., one year after his convictions finalized on December 22, 2020, the last day (90th day) he could have filed a certiorari petition in the United States Supreme Court following the North Carolina Supreme Court's denial of his petition for discretionary review on September 23, 2020. (Petition (Doc. 1) at 13.) Accordingly, Petitioner's proposed new claim qualifies as timely under Section 2254(d)(1) only if it "relates back" to his Petition submitted on December 21, 2021, one day before the

-17-

expiration of the statute of limitations. Under the circumstances presented here, the relation-back doctrine would only save "a claim . . . that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading," Fed. R. Civ. P. 15(c)(1)(B). In the context of a habeas petition, "conduct, transaction, or occurrence" does not mean a petitioner's entire trial or sentencing. *Mayle*, 545 U.S. at 664. Instead, only newly proposed claims linked as to "'time and type'" with timely claims relate back. <u>United States v. Pittman</u>, 209 F.3d 314, 318 (4th Cir. 2000) (quoting <u>United States v. Craycraft</u>, 167 F.3d 451, 457 (8th Cir. 1999)).

Here, Petitioner's proposed new ineffective assistance of appellate counsel claim differs in "time and type" from Grounds One through Four. As discussed above, Grounds One and Two challenge various *pre-trial* actions by *State actors*, i.e., the *State highway patrolman's* submission in *January 2018* of an allegedly conclusory and overbroad affidavit in support of the search warrant for Petitioner's cellphones (Petition (Doc. 1) at 5), and purportedly inexcusable delay from *December 2016 to January 2018* by the *State highway patrol* in seeking the search warrant (<u>id</u>. at 7), and Ground Three contests the use *at trial in February 2018* by the *State* of two witnesses discovered

through the allegedly unconstitutional search of Petitioner's cellphones (id. at 8). Ground Four focuses on the *Court of Appeals*, at the time it issued its decision in *March 2020*, applying an improper harmlessness standard to Petitioner's Fourth Amendment argument regarding the unlawful search of his cellphones. (Id. at 10.) In contrast, Petitioner's proposed new claim involves the actions of his *appellate counsel* during the pendency of Petitioner's direct appeal (*March 2018 to March 2020*) in failing to raise a claim that the trial court erred by denying Petitioner's request for a special verdict form for the second degree-murder charge. As those facts make clear, Grounds One through Four differ in both time and type from Petitioner's proposed new ineffective assistance claim, and that new claim thus does not "relate back" to claims in the Petition under Rule 15(c)(2). As a result, Section 2244(d)(1) bars Petitioner's proposed new claim and renders futile his attempt to add the claim. Further, because the court will deny Petitioner's motion to amend the Petition, no basis exists for the court to stay the Petition to enable him to exhaust his appellate ineffectiveness claim in the state courts.

-19-

Case 1:21-cv-00968-WO-LPA   Document 9   Filed 09/20/22   Page 19 of 20

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that Respondent's Motion for Summary Judgment (Doc. 5) is **GRANTED,** that Petitioner's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1) is **DENIED,** that Petitioner's Motion for Leave to Amend Petition Pursuant to Rule 15(a)(2) and Motion to Stay and Abeyance (Doc. 7) is **DENIED,** and that this action is **DISMISSED** with prejudice.

A Judgment dismissing this action will be entered contemporaneously with this Order. Finding no substantial issue for appeal concerning the denial of a constitutional right affecting the conviction, nor a debatable procedural ruling, a certificate of appealability is not issued.

This the 20th day of September, 2022.

_____
United States District Judge